IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| B&L Transportation, Inc., | ) | |
| Plaintiff | ) | |
| | ) | No. |
| v. | ) | |
| | ) | |
| | ) | Jury Trial Demanded |
| NAVISTAR, INC., a Delaware Corporation, | ) | |
| NAVISTAR INTERNATIONAL CORP., | ) | |
| a Delaware Corporation, and IC BUS, LLC, an | ) | |
| Arkansas Limited Liability Company, | ) | |
| Defendants | ) | |

_____

## COMPLAINT

Plaintiff B&L Transportation Inc., ("B&L") by and through undersigned counsel, against Defendants Navistar, Inc. ("Navistar"), Navistar International Corp. ("Navistar International") and IC Corp. ("IC"), states as follows:

## COUNT I– RICO CLAIM (18 U.S.C. §1962(b))

### A. Introduction and Overview

1.     This lawsuit alleges violations of the federal Racketeer and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962(b), *et seq*., and Louisiana Revised Statutes 15:1352, *et seq.*, applicable to B&L Transportation Inc.'s ("B&L") purchase of school buses manufactured, marketed and sold by defendants Navistar, Inc. ("Navistar") and IC Bus, LLC ("IC"), both of which are wholly-owned subsidiaries of defendant, Navistar International Corp. ("Navistar International").

2.     For at least eight years, from 2004 to 2008, Navistar knowingly, intentionally and fraudulently installed defendants' MaxxForce 7-liter diesel engines, and Navistar's equally-defective, predecessor diesel engine, the VT365 – which employed a slightly earlier version of the same defective emissions control- and other systems as the Navistar/IC MaxxForce 7-liter diesel

engines (the "Defective Engines) – in, *inter alia*, defendants' 71-, 30-, 5+24-, and 3+12- seat school buses (including defendants' wheelchair-equipped buses used for special needs students).

3.      During the same time period, defendants also knowingly, intentionally and fraudulently installed an ABS braking system manufactured by a third-party supplier ("the Defective Brake System") in the same buses in which defendants' also installed their Defective Engines, including those buses purchased by B&L.

4.      Navistar and/or its sister company, IC, knowingly, intentionally and fraudulently sold their buses with defendants' Defective Engines and Defective Brake Systems into interstate commerce exclusively through their own, authorized dealers.

5.      Between 2004 and 2015, B&L purchased several Navistar/IC buses of various sizes and seat configurations, including wheelchair-equipped buses for special needs children, and all of these buses were and are equipped with defendants' Defective Engines and Defective Brake Systems.

6.      After B&L purchased the buses with their Defective Engines and Defective Brake Systems, B&L unwittingly leased those same buses and has borne the cost of having those vehicles repaired. Moreover, B&L did not become aware of the defendants' actions as outlined herein until on or about June of 2016.

## The Genesis of Defendants' Defective Engines

7.      As described more fully below, in or about the year 2000, in a disastrous attempt to meet final diesel emission standards announced on January 18, 2001, by the United States Environmental Protection Agency ("USEPA") (which were to go into effect in 2010, and since 2010, actually *did* go into effect in 2010), Navistar/IC's Defective Engines have employed, and *continue* to employ, Navistar's diesel engine emission Exhaust Gas Recirculation ("EGR") system.

8.      The EGR system is a botched technology that not only failed to meet the USEPA's 2010 emission standards, but in the process of Navistar's/IC's unsuccessful efforts to meet those standards, those defendants also destroyed the performance, operational and service capabilities of their diesel engines and related systems which have so consistently experienced control failures and other malfunctions that Navistar's/IC's EGR diesel engines are now the subject of multiple, class-action lawsuits filed around the country by owners and operators of tractor-trailer trucks (but not school buses) using Navistar's larger, but otherwise identical, MaxxForce 13-liter diesel engines.

9.      These class-action cases have been consolidated in the United States District Court for the Northern District of Illinois as MDL 2590, *In re: Navistar MaxxForce Engines*.

10.      Moreover, on March 31, 2016, the United States Securities and Exchange Commission ("SEC") filed a securities fraud complaint in the United States District Court for the Northern District of Illinois against former Navistar president and CEO Daniel C. Ustian ("Ustian"), docketed as No. 16 C 3885 ("*SEC Complaint*") who was behind Navistar's, Navistar International's, and IC's adoption and use of the EGR technology.

11.      The *SEC Complaint* alleges, *inter alia*, that from late 2010 through 2012, Ustian and Navistar deliberately deceived investors – and of course, by implication, Navistar/IC customers such as B&L who continued to purchase Navistar/IC new and used vehicles – about the success of Navistar's efforts to meet the USEPA's 2010 emissions standards originally announced on or about January 18, 2001.

12.      The SEC alleges that it was:

> … well known to Ustian and Navistar, [that] Navistar's engineers were having difficulty developing and certifying an EGR-only engine that could meet the [US EPA's 2010] 0.20 NOx standard without sacrificing fuel economy and other performance features, discussions with the EPA were at an impasse, and Navistar's

applications [for approval of proposed Navistar EGR-only engines] were going nowhere.

Nonetheless, from 2010 through 2012, instead of coming clean with the public regarding the difficulties Navistar was experiencing in developing and certifying a competitive EGR-only engine, Ustian engaged in a coverup. During this period, Ustian and Navistar made false and misleading public statements that led investors [and customers] to believe that Navistar's efforts to produce a commercially competitive EGR-only engine meeting the 0.20 NOx standard were proceeding without major engineering or EPA roadblocks

*SEC Complaint*, ¶¶ 11-1211-12.

### B. Parties

13.    Plaintiff B&L Transportation, Inc. ("B&L") is a Louisiana corporation with an office in Larose, Louisiana.

14.    B&L has been in the business of providing bussing services to schools and school districts, as well as for private charter, throughout Louisiana for some time.

15.    B&L's still-growing bus fleet includes multi-seat school buses (including special, wheelchair equipped buses), many of which were manufactured by Navistar, including those containing the Defective Engines and Brake Systems produced, integrated, and installed by Navistar/IC.

16.    As set forth above, defendant Navistar, Inc. ("Navistar") is a subsidiary of the Navistar International Corporation (formerly known as International Harvester Corporation or "Navistar International"), and it, like its parent Navistar International, is a Delaware corporation, authorized to do business in Illinois, and headquartered in Lisle, Illinois.

17.    Navistar International's subsidiaries and affiliates, including defendant Navistar, produce commercial and military trucks, buses, diesel engines, RVs, and chassis, as well as providing parts and services for its vehicles.

18.    Navistar manufactured, produced and marketed its 7-liter MaxxForce diesel-powered

school buses throughout the country, both directly and through its sister company and co-defendant, IC.

19.     IC is an Arkansas limited liability company authorized to do business in the State of Louisiana.

## C. Jurisdiction and Venue

20.     This Court has jurisdiction over this matter pursuant to 18 U.S.C. §1964(c).

21.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) in that a substantial part of the events or omissions giving rise to B&L's claims occurred in this judicial district

22.     This Court has personal jurisdiction over all of the defendants in that, at all relevant times hereto, they have resided, and/or have transacted business in this judicial district.

## D. The RICO Enterprise

23.     Navistar, with its parent company Navistar International, and its affiliate, IC, heads and controls an association-in-fact RICO enterprise comprising a second tier of Navistar-authorized dealers of new and used Navistar/IC vehicles, including buses, as well as a third tier of Navistar-authorized repair and service facilities.

24.     Navistar/IC vehicles, including buses, can only be purchased from Navistar-authorized dealers, and generally, they can only be serviced at Navistar-authorized repair and service facilities.

25.     If the vehicle is out of warranty, there are a limited number of repairs that an owner or lessee can perform itself and, in some instances, in order to do so, the owner or lessor must pay a $10,000 annual fee to Navistar simply to have access to a parts list so that the correct part can be ordered from Navistar through a Navistar-authorized repair and service facility.

26.     That structure allowed Navistar, Navistar International and IC to control all information concerning their development, marketing, sales and servicing of their Defective Engines and

Defective Brake Systems, while ensuring that all revenue from those activities remains within the RICO enterprise and contributes to the continuation and operation of the RICO enterprise.

27.    As set forth below in greater detail, Navistar – through Ustian and others – repeatedly and publicly falsely touted the advances that Navistar was making with the development of their EGR technology in their Defective Engines thereby misleading both the investing public and the purchasers of the Navistar/IC vehicles, including buses.

28.    Although, for example, it was widely known within Navistar, its authorized dealers and authorized service and repair facilities, *i.e.*, the RICO enterprise, from in or around early 2001 through 2012 that the EGR technology was a failure in terms of both emissions control, *and* because of the EGR technology's adverse impact on the performance and reliability of the Navistar/IC vehicles in which the Defective Engines were installed, neither the Navistar-authorized dealers, nor the Navistar-authorized service and repair facilities disclosed any of the defects to purchasers of the Navistar/IC vehicles including buses.

29.    Instead, taking advantage of Navistar's continuing, deliberate and fraudulent public misrepresentations as to the purported quality of the Defective Engines, and the deliberate concealment of the defects in the Defective Brake Systems, Navistar's authorized dealers continued selling the Navistar/IC vehicles, reaping the monetary benefit of the resulting sales proceeds in return for their not disclosing the vehicles' known defects and/or not revealing Navistar's, Navistar International's and IC's fraud on the investing and vehicle-purchasing public.

30.    Similarly, the Navistar-authorized service and repair facilities continued collecting the revenue from the excessive repairs needed just to keep the Navistar/IC vehicles, including buses, functioning and on the road; the excessive repairs resulting from the inherent defects in the Defective Engines and Defective Brake Systems.

31.     Meanwhile, the Navistar-authorized service and repair facilities concealed the defendants' fraud by continually and consistently falsely blaming the need for the vehicles' excessive repairs on the vehicles' owners and/or operators, instead of exposing Navistar's, Navistar International's and IC's fraud on the investing and vehicle-purchasing public.

## E. The Defendants' Pattern of Racketeering Activity

**I.The EPA Emissions Regulatory Regime**

32.     The defendants' primary impetus for their wrongful acts was the Clean Air Act Extension of 1970 ("the Clean-Air Act"), 42 USCA §§ 7521–7551.

33.     The Clean-Air Act provides the framework for the regulation of emissions from motor vehicles and engines operated in the United States.

34.     In compliance with the requirements of the Act, on January 18, 2001 (giving manufacturers significant lead time) the "EPA issued its Final Rule-Control of Air Pollution from New Motor Vehicles: Heavy-Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur Control Requirements (Final Rule), effective March 1, 2001.

35.     The Final Rule in part states:

> We are establishing a comprehensive national control program that will regulate the heavy-duty vehicle and its fuel as a single system. As a part of this program, new emissions standards will begin to take effect in model year 2007, and will apply to heavy- duty highway engines and vehicles. These standards are based upon the use of high-efficiency catalytic exhaust emission control devices or comparably effective advancetechnologies. Because these devices are damaged by sulfur, we are also reducing the level of sulfur in highway diesel fuel significantly by mid-2006.

> 66 Fed. Reg. 5002 (Jan. 18, 2001).

36.     The EPA standard heavy-duty, on-highway, diesel emission standard (referred to herein as the "2007 EPA Emission Standard") was promulgated in 2001 so as to "provide engine manufacturers with the lead time needed to effectively phase-in the exhaust emissions control

technology that will be used to achieve the emission benefits of the new standard." *Id*.

37.     The 2007 EPA Emission Standard regulated diesel vehicle/engine emission standards and diesel fuel standards simultaneously, as a single system:

> These options will ensure that there is widespread availability and supply of low sulfur diesel fuel from the very beginning of the program, and will provide engine manufacturers with the lead time needed to efficiently phase-in the exhaust emission control technology that will be used to achieve the emissions benefits of the new standards.

> *Id.*

38.     Following the EPA's issuance of its January 18, 2001 Final Rule, Navistar and its competitors focused on developing and perfecting engine technologies to meet the strict EPA emission standards that would ultimately apply to all 2010 model year trucks and engines.

39.     Even prior to the EPA's January 18, 2001 announcement, however, by in or around 2000, two different engine technologies already had been created in an effort to limit the carbon and other emissions of diesel engines, and these two technologies subsequently competed to satisfy the 2010 diesel emission standards of the EPA after the EPA announced them on January 18, 2001.

40.     The EGR (Exhaust Gas Recirculation) process was adopted and adapted by Navistar, which aggressively championed its superiority in reducing emissions by displacing oxygen to reduce exhaust pollutants while within the engine (*i.e.*, "in-cylinder").

41.     The standard widespread and competing technology, however, was called "Selective Catalytic Reduction ("SCR"), a process that reduced emissions by treating the engine exhaust with a urea-based solution injected into the exhaust-stream and combined with the exhaust after leaving the engine cylinders.

42.     Each one of Navistar's meaningful competitors (*i.e.*, Mack, Volvo, Daimler, PACCAR,

*etc.*) proceeded to perfect the SCR system and timely receive their EPA certification.

43.     Navistar, however, disregarded the prevailing engineering consensus and represented that it would develop an EGR reliant engine that also would be EPA-certified on a timely basis.

44.     Navistar subsequently spent hundreds of millions of dollars to develop and market its "Advanced EGR" engines, including the VT-365 and 7-MaxxForce engines which Navistar and IC began installing in buses in 2004.

45.     These engines were still in the developmental stage, and while they showed some initial improvement in emissions control, the reliability and performance issues inherent in the EGR system also began to manifest themselves.

46.     Finally, after approximately $700 million in expenditures, Navistar still was unable to commence filing an application for certification of its Defective Engines with the EPA even 10 months *after* the applicable EPA standards had become effective and over six (6) years from when the new and final EPA requirements were released to the industry on January 18, 2001.

47.     Thus, it soon became clear to Navistar's top management and to Navistar's other key personnel that its decision to proceed with EGR, and to differentiate its diesel emission control technology from SCR was a failure that would result in significant warranty and performance exposure, but those material facts were willfully and intentionally concealed from the public – including purchasers like B&L – by Navistar, Navistar International, IC and Navistar's authorized dealers and service and repair facilities.

48.     Instead, in order to continue selling its vehicles and generating cash flow, Navistar began selling non-conforming engines by exhausting EPA credits it had previously accrued on earlier versions of its engines, and, when those credits were exhausted, Navistar paid a non-compliance fine to the EPA for each diesel engine sold that did not meet the new standard.

49.     Thus, defendants knew for years that they were facing technological and developmental problems that were extremely serious, but those problems were never revealed to purchasers and/or lessees of Navistar/IC buses such as B&L, who continued purchasing the Navistar/IC buses from Navistar-authorized dealers and private parties with their Defective Engines and Defective Brake Systems, and continued servicing them at, or through Navistar-authorized service and repair facilities based on Navistar's fraudulent public statements, and Navistar's concealment of the true, material facts by the Navistar-authorized dealers and service and repair facilities.

**II.The Predicate Acts in Violation of 18 U.S.C.A. §§1341 and 1343**

50.     Defendants, further concealed their engines' deficiencies and furthered their own collective fraud in order to continue their improper sales process by issuing numerous press releases and holding conference calls with investors and the public over the interstate wires – both activities violating 18 U.S.C.A. § 1343 ("the wire fraud statute") – typically every time Navistar International filed a quarterly or annual report with the Securities and Exchange Commission.

51.     Navistar and Navistar International also issued other communications over the interstate wires in violation of the wire fraud statute, as well as through the United States mails in violation of 18 U.S.C.A. § 1341 ("the mail fraud statute"), that were relied on by both investors, and vehicle purchasers and/or lessees throughout the marketplace, including B&L.

52.     Those false and fraudulent statements touted EGR's superiority, and further stated that the EGR process would revolutionize, and was revolutionizing Navistar's compliance with the EPA's 2010 emission standards through defendants' EGR technology which, Navistar claimed, was able to accomplish, and had, accomplished the necessary exhaust compliance requirements.

53.     For example, in conjunction with its publicly-filed, December 11, 2006 Form 8-K Report, which was filed using, and intentionally made publicly available over the interstate wires through

EDGAR – Navistar International falsely indicated that it was continuing to improve its Defective Engines, stating, "[w]e expect to achieve fuel economy, durability/reliability and performance neutrality compared to our 2006 engine. Our plan is to offset the decreased energy content of ultra low (sic) sulfur diesel fuel and the small fuel usage for active regeneration with improvements in the basic engine combustion system and electronic controls." Exhibit A hereto.

54.     The December 11, 2006 Form 8-K Report also contained material that was subsequently used in Navistar International's December 15, 2006 investor (and public) conference call conducted over the interstate wires.

55.     These materials asserted that Navistar's "engine plans to achieve 2009 goals" included the "recovery of emissions", "MaxxForce Big Bore" (referring to Navistar's efforts to develop large diesel engines for the trucking industry using the EGR technology), and most misleadingly, having a "competitive advantage in 2010 emissions technology". Exhibit A hereto.

56.     These public statements (conveyed over the interstate wires in violation of the wire fraud statute to the investing and to the vehicle-purchasing and vehicle-leasing public) not only failed to reveal the limitations with Navistar's EGR system, and the resulting deterioration in reliability and performance that Navistar and its engineers had *already* encountered with the Defective Engines with the EGR system, but these statements gave the misleading impression to the public, including B&L, that Navistar was successfully moving forward on actually *expanding* its use of its EGR technology.

57.     Three months later, in Navistar International's March 1, 2007 Form 8-K – again filed, and intentionally made publicly available through EDGAR over the interstate wires – Navistar featured its "great products: engine", featuring its 2006 VT-365 and that engine's 2007 replacement the MaxxForce 7, hyping them as a "value proposition" for the engines' purported "reliability",

"performance", and "fuel economy". Exhibit B hereto.

58.     Once again, this filing revealed nothing of the actual problems with reliability and performance that Navistar was actually experiencing trying to develop its EGR systems that were being used in defendants' engines.

59.     Three weeks later, Navistar International filed a Form 8-K, which again included exhibits to be used in its March 20, 2007 investor (and public) conference call which summarized Navistar's supposed "keys to success". Exhibit C hereto.

60.     These purported "keys to success" included Navistar/IC's 2007 MaxxForce 5 through 10 engine launches (which in part, replaced the earlier VT-365 version of Navistar/IC's Defective Engine), plus the production of the MaxxForce 11-liter and 13-liter truck engines which were to begin production in late 2007, while Navistar further claimed that it would "continue to focus and invest in *quality*" (emphasis added).

61.     Again, these statements failed to reveal, and instead, deliberately concealed Navistar/IC's continuing failure both to perfect their EGR systems, and to correct the ever-increasing reliability and performance issues that worsened with every marginal improvement to the EGR systems.

62.     Over the next year, Navistar International continued filing, and intentionally making publicly available through EDGAR over the interstate wires, its quarterly Form 8-K and annual reports.

63.     On March 6, 2008, Navistar International filed, and intentionally made publicly available its then-current Form 8-K, doing so through EDGAR over the interstate wires. Exhibit D hereto.

64.     The March 6, 2008 Form 8-K stated, *inter alia*, "[s]ince 2004, our focus on reliability and quality has produced a significantly improved 2007 emissions-compliant engine, currently in the market…" Exhibit D hereto.

65.    That statement was false for the reasons explained above and it failed to disclose Navistar's problems with its Defective Engines.

66.    Approximately 2 months later, Navistar International filed its May 27, 2008 Form 8-K Report in which it presented Navistar's "strategy to sustain an improved 2010 and beyond", explaining "why we chose EGR vs SCR. Exhibit E hereto.

67.    According to the May 27, 2008 Form 8-K (filed, and intentionally made publicly available through EDGAR over the interstate wires), "we believe SCR is a traditional-stopgap approach; SCR forces the burden of compliance on the customer; EGR builds on technologies we are using today without ongoing customer cost, complexity, and inconvenience; [and] minimal, if any, effect on fuel economy". Exhibit E hereto.

68.    Based on its own experiences over the preceding seven years, Navistar International – and certainly Navistar/IC – knew that its purported "belief" about SCR being a "stopgap approach" had no basis in fact, and was meant simply to disparage what Navistar International, and Navistar/IC knew was the actually successful technology.

69.    Navistar International and Navistar/IC also knew that the statements that their EGR technology lacked "ongoing customer cost, complexity, and inconvenience" and that the technology had "minimal, if any, effect on fuel economy" were false.

70.    Nevertheless, in the February 9, 2009 issue of *Transport Topics*, Exhibit F hereto, Navistar continued peddling the false notion that EGR was superior to SCR. Exhibit F hereto.

71.    *Transport Topics* is a major trucking industry publication available digitally over the interstate wires, and in print through the United States mails.

72.    After explaining the difference between the SCR and EGR systems, the *Transport Topics* article noted that Navistar was "the only manufacturer to offer what it calls 'enhanced' exhaust gas recirculation, an update of technology that trucks have used since 2002 to meet Environmental

Protection Agency mandates."

73.     The article quotes Timothy Shick, Navistar's director of marketing for the engine group as stating, "Navistar has been building EGR engines since 2004 and we have been *perfecting* the technology all the time…" ("Emphasis added").

74.     *Transport Topics* also quotes Ustian who criticized the SCR system stating, " '[t]he other thing that EGR avoids is the risks of an SCR strategy… Read the label on this and it will show you that there are challenges with keeping control of using this [SCR] technology: "Store between 23 degrees and 68 degrees." So essentially it says you can't throw it outside… You can't operate it in conditions above 85 [degrees] or below 12 [degrees]. You can, but… it will put the burden on to the customers."

75.     Both Shick's and Ustian's were false at the time they were made: Navistar was not "perfecting" its EGR technology "all the time" but, instead, was facing mounting problems with the technology in terms of emissions, performance and reliability.

76.     Moreover, Ustian mischaracterized the nature and limitations of the SCR system which was, in fact, superior to Navistar's EGR system.

77.     This was hardly the only time that Ustian mischaracterized the EGR and SCR systems, or falsely compared them.

78.     In late 2007, Ustian told investors, "[Navistar's] ability to achieve our goals without adding customer cost and inconvenience [through EGR] is a competitive advantage."

79.     Ustian's statements, again, falsely indicated, not only that Navistar was succeeding in developing its EGR technology, but that Navistar had succeeded so well that it was actually surpassing the achievements of its competitors.

80.     Between November 2010 and January 2011 alone, Ustian falsely stated:

– "We're 100% there in terms of our ability to do it [achieve 0.20g NOx] ...."

– "[W]e'll be applying for our 0.2 certification here in the next couple of months."

– Because of all the anxiety that is out there, we're going to certify that over the next few months here at 0.2 grams ....

– "Since we were the only ones out there, there is a lot coming at us with this can't work and, of course, now we are out in the marketplace and that's over. That argument is over. We are out there in the marketplace. We are exceeding what we had committed to in terms of performance and fuel economy and all that. So that's over."

– "We will show you that product, by the way, in Melrose Park [Illinois] on the 25th. We will show you the modifications. It won't be a great drama to you because you won't be able to see anything other than - we would be able to show you the data that it meets 0.2 and show you how we are able to meet it." (Emphasis added.)

81.   In fact, the EGR technology was never ready for regular commercial use and was not "out there in the marketplace" with a conforming diesel engine as Navistar represented.

82.   The true facts, known by Navistar International, and by Navistar/IC, but concealed from the public, and from prospective and actual purchasers and lessees of Navistar's buses equipped with Navistar's Defective Engines, including B&L, were:

a.   Navistar's method for compliance with EPA guidelines had been a failure requiring that Navistar revise its plan to meet emission requirements through its engineering acumen, thus resulting in a patchwork, compromised engine prone to a need for excessive repairs and additional enhancement.

b.   Navistar did not timely have engines available to meet the 2010 EPA standards, as it

previously had assured the vehicle-purchasing and leasing public such as B&L and its lessees; rather Navistar was, in fact, left far "behind the curve", so that it and/or IC necessarily sold a diesel engine lacking a perfected capability and suitable design.

c. Navistar's DT-365 and MaxxForce 7-liter diesel engines and related equipment for its buses were defective as sold by Navistar and/or IC, hastily and imperfectly manufactured.

d. The engines and related systems would invariably subject bus owners, such as B&L, and lessees using defendants' buses with their Defective Engines to experience substantial "downtime," *i.e.*, periods of inoperability, coupled with extensive repair costs for systemic engine failure related to faulty fuel injectors, EGR valves, cooler and other EGR system components, including the engine's oil cooler, main computers ("HCU"), Sohn canisters, inspection drive modules ("IDRs") and a chronically flawed turbo charger "system."

e. On information and belief, a large portion of Navistar's MaxxForce 7-liter diesel engines were manufactured in Mexico using inferior metal that melted and collapsed internally causing, or contributing to these problems;

f. Based on the above, Navistar/IC lacked a basis for selling their MaxxForce 7-liter diesel engine in Navistar's school bus line on the terms and conditions shared with unwary "customers."

83. Moreover, neither Navistar, nor IC ever acknowledged that there were *any* defects at all in their brake systems despite the fact that their brake system's main ABS computer consistently and repeatedly goes bad, leaving each bus's parking brake "locked up" and unable to move without repairs, potentially stranding dozens of children, including special needs children.

84. Defendants further concealed their fraud and the inherent problems with their Defective Engines and Defective Brake Systems by having their authorized service centers – the only places

where defendants' buses could be serviced, or through which an owner and/or lessee could procure necessary parts for do-it-yourself repairs – repeatedly advise owners that ongoing problems with the Defective Engines and Defective Brake Systems were the result of user error.

85. Defendants marketed and sold their buses equipped with their Defective Engines and Defective Brake Systems through material omissions and/or materially false and misleading statements to the consuming public, including B&L, concerning the purported reliability, durability and endurance of, *inter alia*, the EGR diesel emission control systems of the Defective Engines that Navistar/IC sold in their school buses.

86. For example, as late as 2011 in another Navistar Engine Group brochure available, *inter alia*, through the Internet over the interstate wires, Exhibit G hereto at 2, Navistar was still claiming that " 'Always Performing' is our *promise* to our customers that they are buying the *best performing engine* with the commitment of Navistar Engine Group employees *and our dealers standing behind every product.* (Emphasis added).

87. The brochure further stated that Navistar was "developing clean diesel power solutions without sacrificing the reason diesel has been the power choice of industry for 100 years: power, economy, durability and reliability."

"Always performing" was a false "promise"; Navistar had already "sacrificed" its vehicles' "power, economy, durability and reliability" in its vain efforts to perfect the failed EGR technology.

88. Defendants' marketing misrepresented and omitted material facts about Navistar's Defective Engines and Defective Brake Systems, including without limitation, that Navistar's EGR diesel engines failed to comply with mandatory regulations and standards required by the United States Environmental Protection Agency ("EPA") for 2010 (and newer) vehicles in accordance

with strict EPA emissions standards, but more importantly for B&L, those marketing materials failed to disclose that, in a vain effort to meet the mandatory EPA 2010 standards, defendants had continued relying upon, and tinkering with the defective engine design (that already had been abandoned by everyone else in the industry) with the primary result of a loss of "power, economy, durability and reliability" in Navistar/IC's vehicles, including the buses purchased by B&L.

89.     As further proof of defendants' efforts to fraudulently conceal the defects in their engines and brake systems to enable defendants to continue selling their buses with their Defective Engines and Defective Brake Systems to the unsuspecting public including B&L and its lessees, unlike defendants' major competitor, Blue Bird Corporation ("Blue Bird") – which sends repeated notices of warranty and safety recalls to purchasers of its buses – B&L did not receive any recall notices from defendants.

90.     The defendants' knowingly and intentionally false and fraudulent statements, as set forth above, as well as all three defendants', and the RICO enterprise's knowing, intentional and deliberate concealment of the actual facts concerning defendants' Defective Engines and Defective Brake Systems perpetuated the vehicle-purchasing and leasing public's false perception that Navistar manufactured and sold products *only* of substantial quality, even though the actual facts, well-known to the defendants and to the RICO enterprise, were directly contrary to that public perception.

91.     Navistar and Navistar International deliberately, intentionally and fraudulently concealed those actual facts--which, again, were well-known to the three defendants at the time that the public statements were made –from the investing and vehicle-purchasing public through Navistar's and Navistar International's public statements which were made in violation of the wire and mail fraud statutes as set forth above.

92.    Navistar and Navistar International knowingly and intentionally made their false and fraudulent statements precisely to perpetuate the vehicle-purchasing public's false perception of the quality of the Navistar/IC buses specifically to deceive the vehicle-purchasing and vehicle leasing public, including B&L, into continuing to purchase and lease defendants' vehicles by fraudulently concealing the true facts.

93.    Those facts were that, despite Navistar/IC's decade-long efforts to "perfect" their EGR technology, they had, instead, merely created vehicles with engines that fell well below defendants' own descriptions of their vehicles in terms of those vehicles' emissions control, reliability, and performance including fuel consumption, and with severely flawed brake systems.

## III. Plaintiffs' Victimization By, and Damages Proximately Resulting from Defendants' Wrongful Actions

94.    As stated above, B&L has repeatedly taken its leased Navistar/IC buses to repair and service facilities for repairs to its fleet's Defective Engines and Defective Brake Systems, but the service facilities have failed to perform adequate, suitable or capable repairs and *none* have provided more than short-term remedies before B&L's buses had to be returned for further repairs because the problems needing repair lie within the design of the Defective Engines and Defective Brake Systems, themselves, and therefore are irreparable.

95.    B&L has also performed limited types of repairs to its Navistar/IC buses but, like similarly situated customers, defendants exercise some degree of control over those in-house repairs by requiring owners or operators of their school buses who or which perform repairs themselves to access to Navistar/IC's parts lists for school buses.

96.    The parts list is necessary because parts for Navistar/IC school buses are not available anywhere except through Navistar-authorized service and repair facilities and must be ordered by the part's number.

97.     Even then, as B&L has endured multiple times since purchasing said busses, the necessary part is not available when ordered, and it frequently takes days or even weeks for the part to arrive for B&L to pick up, thereby resulting in down time because the bus cannot be used until repaired.

98.     The delay in parts availability is substantially worsened by the much greater frequency with which defendants' buses require repairs due to the defects in their Defective Engines and Defective Brake Systems, as compared to buses manufactured and sold by defendants' competitors.

99.     Despite having hundreds of opportunities to disclose the truth during B&L's trips to Navistar-authorized repair and service facilities either to have buses repaired, or to order and purchase replacement parts for the buses, neither the Navistar-authorized repair and service facilities that B&L used for repairs, and/or the purchase of replacement parts, nor the Navistar-authorized dealer from which B&L purchased the Navistar/IC buses that it leased, ever informed either B&L or its lessees that the Defective Engines and Defective Brake Systems in defendants' buses could not, in fact, be "repaired" because the engines and brake systems were, themselves, inherently defective because of their designs.

100.    As set forth above, Navistar and Navistar International repeatedly, affirmatively misrepresented the facts concerning the quality and performance of their Defective Engines and Defective Brake Systems, and they also actively concealed the true, material facts concerning defendants' Defective Engines and Defective Brake Systems by refusing to reveal the true facts despite their repeated, contrary public statements.

101.    Defendants' concealment of the true, material facts concerning defendants' Defective Engines and Defective Brake Systems was intended to induce a false belief in the purchasing public, including B&L, that the Navistar/IC Defective Engines and Defective Brake Systems were, in fact, at least comparable to all other similar engines and brake systems in being free of any

significant defects, and in fact, those statements were intended to induce the false belief in the investing, as well as the school bus purchasing and leasing public that Navistar/IC's systems were actually state-of-the-art.

102.    The truth behind Navistar's and Navistar International's false and fraudulent statements could not have been discovered by the vehicle-purchasing and/or leasing public, including B&L, through a reasonable inquiry or inspection of the Navistar/IC Defective Engines and Defective Brake Systems because the defects were design flaws which defendants kept concealed, at least from B&L, and on information and belief based on defendants' treatment of B&L, from the rest of the school bus purchasing and leasing public through the repeated explanations by the Navistar-authorized servicer repair facilities that B&L was the only Navistar/IC bus operator experiencing problems with the Navistar/IC Defective Engines and Defective Brake Systems, and that the problems were due to the way B&L's lessees operated the buses.

103.    B&L relied on defendants' silence as to the true facts concerning their Defective Engines and Defective Brake Systems as a representation that the true facts did not exist.

104.    If B&L had known the true facts, then they would not have purchased and/or leased B&L's fleet of Navistar/IC school buses.

105.    Defendants' active concealment of the true facts concerning their Defective Engines and Defective Brake Systems, as well as their other deceptive conduct, as set forth above, were all performed with the intention of deceiving the vehicle-purchasing and leasing public, including B&L, into continuing to purchase and/or lease the Navistar/IC buses and this active concealment created an opportunity and a duty for defendants to speak the truth, but defendants fraudulently, repeatedly refused to do so.

106.    As a direct and proximate result of B&L's reliance on defendants' and the RICO

enterprise's fraudulent concealment of the true facts concerning defendants' Defective Engines and Defective Brake Systems, B&L purchased and leased Navistar/IC buses in various seating configurations, but all of which have experienced the same problems: the failure and/or repeated failure of engine and braking system parts, plus the cost of other necessary parts and labor for *each* replacement, resulting in economic damages to B&L.

107.    Additionally, when B&L's Navistar/IC leased buses required repair, frequently there were no parts available at the Navistar-authorized service and repair centers and/or the repairs themselves took anywhere from several days to a week or more resulting in average downtime for each bus while waiting for repairs and/or replacement parts.

108.    Depending on the size of the bus, when B&L's leased Navistar/IC buses were capable of operating, they generate, and are expected to generate substantial revenue.

109.    As a direct and proximate result of the Navistar/IC buses' excessive downtime, B&L has sustained losses to its revenue stream.

110.    In addition to the Navistar/IC buses' excessive repair and operating costs, plus their resulting loss of revenue due to disproportionate downtime resulting from the Defective Engines and Defective Brake Systems, Navistar's buses also suffer from a shortened lifespan – roughly half that of other manufacturers' buses – and all of these conditions has resulted in a negligible resale and/or trade-in value when compared to other school buses such as those manufactured by Blue Bird.

111.    As a result of the diminished resale value, upon resale of its Navistar/IC buses, B&L will sustain losses.

112.    Based on the foregoing facts, defendants' fraudulent conduct was done willfully and wantonly.

WHEREFORE, Plaintiff B&L Transportation, Inc. respectfully requests judgment against defendants Navistar, Inc., Navistar International Corp. and IC for the following:

      a.  compensatory and treble damages; and

      b.  punitive damages; and

      c.  reasonable attorney's fees; and

      d.  costs; and

      e.  additional relief this Honorable Court deems fair and equitable.

### COUNT II - RICO CLAIM (18 U.S.C. §1962(c))

113.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

114.    As set forth above, defendants Navistar, Navistar International and IC conducted and/or participated directly and/or indirectly in the conducting of the RICO enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C.A. §§ 1341 and 1343.

115.    As a result, Navistar, Navistar International and IC have violated and continue to violate 18 U.S.C. §1962(c) as a direct and proximate result of which, B&L has suffered substantial damages as also set forth above.

WHEREFORE, Plaintiff B&L Transportation, Inc. respectfully requests judgment against defendants Navistar, Inc., Navistar International Corp. and IC for the following:

      a. compensatory and treble damages; and

      b. punitive damages; and

      c. reasonable attorney's fees; and

      d. costs; and

e. additional relief this Honorable Court deems fair and equitable.

## COUNT III - FRAUD

116.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

117.    As set forth above, defendants Navistar, Navistar International and IC engaged in a scheme to defraud, *inter alia*, the vehicle-purchasing and vehicle-leasing public, including B&L and its lessees.

118.    In the course of carrying out their scheme to defraud, Navistar and Navistar International made multiple misrepresentations and/or actively concealed the material facts concerning details in their Defective Engines and Defective Brake Systems.

119.    B&L could not have discovered the truth through a reasonable inquiry or inspection of the Navistar/IC Defective Engines and Defective Brake Systems, and instead relied upon defendants' silence as to the true facts as a representation that the true facts did not exist.

120.    If B&L knew or had known the true facts, then B&L would not have purchased its fleet of Navistar/IC school buses, nor would it have leased its fleet to its lessees.

121.    Defendants' active concealment of the true facts concerning their Defective Engines and Defective Brake Systems and their other deceptive conduct, as set forth above, were all performed with the intention of deceiving the vehicle-purchasing and vehicle-leasing public, including B&L, into continuing to purchase and lease the Navistar/IC buses which created an opportunity and a duty for defendants to speak the truth, but defendants fraudulently, repeatedly refused to do so.

122.    As a direct and proximate result of B&L's respective reliance on defendants' fraudulent concealment of the true facts concerning defendants' Defective Engines and Defective Brake

Systems, B&L purchased several Navistar/IC buses in various seating configurations, which directly and proximately resulted in costs and damages to B&L for repairs and downtime.

123.    Based on the foregoing facts, defendants' fraudulent conduct was done willfully and wantonly.

WHEREFORE, Plaintiff B&L Transportation, Inc. respectfully requests judgment against defendants Navistar, Inc., Navistar International Corp. and IC for the following:

a. compensatory and treble damages; and

b. punitive damages; and

c. reasonable attorney's fees; and

d. costs; and

e. additional relief this Honorable Court deems fair and equitable.

### COUNT IV – LOUISIANA PRODUCTS LIABILITY, REDHIBITION, & WARRANTY

i.    **First Cause of Action: Construction or Composition Defect Under La. R.S. 9:2800.55**

124.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

125.    At all times material to this action, defendants were engaged in the business of designing, developing, manufacturing, promoting, marketing, distributing, integrating, and/or selling Navistar/IC MaxxForce 7-liter diesel engines (the "Defective Engines) and ABS braking systems manufactured by a third-party supplier ("the Defective Brake System").

126.    At all times material to this action, defendants' Defective Engines and Defective Brake Systems were expected to reach, and did reach, consumers in the State of Louisiana

and throughout the United States, including plaintiff, without substantial change in the condition in which they were sold.

127.  At all times material to this action, defendants' Defective Engines and Defective Brake Systems were designed, developed, manufactured, promoted, marketed, distributed, integrated and/or sold by defendants in a defective and unreasonably dangerous condition at the time they were placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

    a.  When placed in the stream of commerce, defendants' Defective Engines and Defective Brake Systems contained manufacturing defects that rendered the subject products unreasonably dangerous;

    b.  The subject products' manufacturing defects occurred while the products were in the possession and control of the defendants;

    c.  The subject products were not made in accordance with the defendants' specifications or performance standards; and

    d.  The subject products' manufacturing defects existed before they left the control of the defendants.

128.  The subject products manufactured and/or supplied by defendants were defective in construction or composition in that, when they left the hands of defendants, the products deviated in a material way from defendants' manufacturing performance standards and/or it differed from otherwise identical products manufactured to the same design formula. The products were unreasonably dangerous in construction or composition as provided by La. R.S. 9:2800.55.

129.  As a result of the foregoing acts and omissions, plaintiffs suffered economic losses including but not limited to excessive repair and operating costs, and losses in revenue due to the disproportionate downtime that resulted from the Defective Engines and Defective Brake Systems.

ii.       **Second Cause of Action: Design Defect Under La. R.S. 9:2800.56**

130.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

131.    Defendants' Navistar/IC MaxxForce 7-liter diesel engines (the "Defective Engines) and ABS braking systems manufactured by a third-party supplier ("the Defective Brake System") are defective in their design and/or formulation in that they are not reasonably fit, suitable, or safe for their intended purpose and/or their foreseeable risks exceed the benefits associated with their design and formulation. The subject products were unreasonably dangerous in design as provided by La. R.S. 9:2800.56.

132.    At all times material to this action, defendants' Defective Engines and Defective Brake Systems were expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States, including plaintiff, without substantial change in the condition in which they were sold.

133.    At all times material to this action, defendants' Defective Engines and Defective Brake Systems were designed, developed, manufactured, promoted, marketed, distributed, integrated and/or sold by defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

> a.   When placed in the stream of commerce, defendants' Defective Engines and Defective Brake Systems contained unreasonably dangerous design defects and were not reasonably safe as intended to be used;
>
> b.   When placed in the stream of commerce, defendants' Defective Engines and Defective Brake Systems were defective in design and formulation, making

their use more dangerous, inefficient, and costly than an ordinary consumer would expect;

c.  Defendants' Defective Engines and Defective Brake Systems design defects existed before they left the control of the Defendants;

d.  Defendants' Defective Engines and Defective Brake Systems were insufficiently tested;

e.  Defendants' Defective Engines and Defective Brake Systems were not accompanied by adequate instructions and/or warnings to fully apprise consumers, including plaintiff, of the performance defects associated with their use, thereby rendering defendants liable to plaintiff.

134.  The Defective Engines and Defective Brake Systems designed, developed, manufactured, promoted, marketed, distributed, integrated and/or sold by defendants were defective in design and/or formulation in that, when it left the hands of the defendants, it was unreasonably dangerous, and was therefore more dangerous than an ordinary consumer would expect.

135.  At all times herein mentioned, defendants' Defective Engines and Defective Brake Systems were in a defective condition and defendants knew, or had reason to know, that said products were defective and potentially unsafe, especially when used in the form and manner as provided by the Defendants.

136.  Defendants knew, or should have known that at all times herein mentioned, the Defective Engines and Defective Brake Systems were in a defective condition, rendering them potentially dangerous and unsafe,

137.  At the time of plaintiff's use of defendants' defective products, defendants' products were being used for their intended purposes, in a manner normally intended.

138.  Defendants had a duty to create products that were not unreasonably dangerous or defective for their normal, intended use.

139.   The Defective Engines and Defective Brake Systems designed, developed, manufactured, promoted, marketed, distributed, integrated and/or sold by defendants reached their intended users in the same defective and unreasonably dangerous condition in which defendants produced them.

140.   In addition, at the time the subject products left the control of the defendants, there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk of plaintiff's losses without impairing the reasonably anticipated or intended function of the product. These alternative designs were economically and technologically feasible, and would have prevented or significantly reduced the risk of plaintiff's losses without substantially impairing the product's utility.

141.   The Plaintiff could not, by the exercise of reasonable care, have discovered the defective engine and Defective Brake System defects herein mentioned.

142.   Said defects in defendants' drug Defective Engines and Defective Brake Systems were a substantial factor in causing plaintiff's losses.

143.   As a result of the foregoing acts and omissions, plaintiffs suffered economic losses including but not limited to excessive repair and operating costs, and losses in revenue due to the disproportionate downtime that resulted from the Defective Engines and Defective Brake Systems.

### III. Third Cause of Action: Inadequate Warning Under La. R.S. 9:2800.57

144.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

145.    The Defective Engines and Defective Brake Systems were defective and unreasonably dangerous when  they left the  possession of  the  defendants, and said products did not contain sufficient warnings  to alert  consumers,  including plaintiff, of the performance defects associated with their use. Thus, the subject products were unreasonably dangerous because an adequate warning was not provided as provided pursuant to La. R.S. 9:2800.57.

146.    The  subject  products  manufactured  and supplied  by defendants were defective due to  inadequate post-marketing warning  or  instruction because,  after  defendants knew  or should have  known  of  the  performance defects, defendants failed  to  provide   an  adequate  warning to  consumers.

147.    Plaintiff used the subject products for their intended purpose.

148.    Plaintiff could not have discovered any defect in the subject products through the exercise of reasonable care.

149.    The  defendants, as  manufacturers  and/or  distributors  of  the  subject products, are held to the level of knowledge of an expert in the field.

150.    Plaintiff relied upon the skill, superior knowledge and judgment of the defendants.

151.    The defendants had a continuing duty to warn plaintiff of defective subject products.

152.    Had plaintiff received adequate warnings regarding the defective engine and Defective Brake System product and performance defects, the plaintiff would not have purchased, used, or continued using said products.

153.    As a result of the foregoing acts and omissions, plaintiffs suffered economic losses including but not limited to excessive repair and operating costs, and losses in revenue due to the disproportionate  downtime  that  resulted  from  the  Defective  Engines  and  Defective  Brake

Systems.

**IV. Fourth Cause of Action: Breach of Express Warranty Under La. R.S. 9:2800.58**

154.    Plaintiff  repeats,  reiterates  and  re-alleges  each  and  every  allegation  of this Complaint contained in each of the foregoing  paragraphs  inclusive, with the same force and effect as if more fully set forth herein.

155.    At all times herein  mentioned,  the  defendants  designed, developed,  manufactured, promoted,  marketed,  distributed,  integrated and/or sold the Defective Engines and Defective Brake Systems.

156.    Defendants  expressly  represented  to plaintiff,  other  consumers,  and the  governmental entities that the Defective Engines and Defective Brake Systems were fit  for  their  intended purpose,  was  of merchantable  quality,  and had been adequately tested.

157.    The  defective  engine  and  brake  systems  do  not  conform  to  defendants' express representations because they do not meet performance and reliability standards.

158.    At  the  time  of  the  making  of  the  express  warranties,  defendants  knew  or should have known of the purpose for which the subject products were to be used and warranted the same to  be, in all  respects,  fit, effective, and proper for such  purpose.   The subject products were unreasonably dangerous and defective because they failed to conform to an express warranty of the defendants as provided by La. R.S. 9:2800.58.

159.    At  the  time  of  the  making  of  the  express  warranties,  defendants  knew  or should have known  that, in fact, said  representations  and warranties  were false, misleading, and  untrue in that the subject  products were not fit for their intended use and, in fact, would cause decreased utility, underperformance, and economic losses.

160.    Plaintiff and other consumers relied upon defendants' express warranties.

161.   The defendants herein breached the aforesaid express warranties, as their MaxxForce engines and ABS brake systems were defective.

162.   Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue in that the Defective Engines and brake systems were not fit for their intended use.

163.   As a result of the foregoing acts and omissions, plaintiffs suffered economic losses including but not limited to excessive repair and operating costs, and losses in revenue due to the disproportionate downtime that resulted from the Defective Engines and Defective Brake Systems.

**V. Fifth Cause of Action: Breach of Implied Warranty of Merchantability and Fitness**

164.   Plaintiff  repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

165.   The defendants impliedly represented and warranted  to consumers and governmental entities that their products were free from defects and fit for the ordinary  purpose for which said products were to be used.

166.   At all relevant times, defendants knew of the use for which the Defective Engines and brake systems were intended and impliedly warranted the product to be of merchantable quality, safe, and fit for use.

167.   Defendants were aware that consumers, including Plaintiff, would use said products in the manner intended.

168.   Plaintiff reasonably relied upon the judgment and sensibility of defendants to sell the

Defective Engines and braking systems only if they were indeed of merchantable quality, safe, and fit for ordinary use.

169.    Defendants breached their implied warranty to consumers, including plaintiff, as the defective engine and braking systems were not of merchantable quality, safe, and fit for their intended use.

170.    Consumers, including plaintiff, reasonably relied upon defendants' implied warranty.

171.    Defendants' defective engine and braking system reached consumers, including plaintiff, without substantial change in the condition in which it was manufactured and sold by Defendants.

172.    That said representations and warranties aforementioned were false, misleading, and inaccurate in that defendants Defective Engines and braking systems were unsafe, not of merchantable quality, and defective.

173.    Plaintiff reasonably relied upon the skill and judgment of defendants as to whether or not the Defective Engines and braking systems were of merchantable quality, safe, and fit for their intended use.

174.    Defendants' Defective Engines and braking systems were placed  into the  stream of commerce  in a defective and unsafe condition. Said products were expected to reach, and did reach, consumers, who came into contact with said products without a substantial change in the condition in which they were sold.

175.    As a result of the foregoing acts and omissions, plaintiffs suffered economic losses including but not limited to excessive repair and operating costs, and losses in revenue due to the disproportionate downtime that resulted from the Defective Engines and Defective Brake Systems.

**VI. Sixth Cause of Action:  Redhibition**

168.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

169.   The subject products contain a vice or defect which renders it useless or its use so inconvenient that buyers would not have purchased it.

170.   Defendants sold and promoted the Defective Engines and braking systems,  which defendants  placed into the stream of commerce.   Under Louisiana law, the seller warrants the buyer against redhibitory defects, or vices, in the thing sold. La.  C.C. Art. 2520.   The subject products, sold  and promoted by defendants,  possess a redhibitory defect because they were not manufactured and/or marketed  in accordance  with  industry  standards  and/or  are unreasonably  dangerous,  as described above, which renders the subject producst useless or so  inconvenient  that  it must be  presumed  that  a  buyer would not have bought the subject product had he known of the defect.  Pursuant to La. C.C.  Art. 2520, plaintiff is entitled to obtain a rescission of the sale of the subject product.

171.   The subject products alternatively possess a redhibitory defect because the subject products were not manufactured and marketed in accordance with industry standards and/or is unreasonably dangerous, as described above, which diminishes the value of the subject product so that it must be presumed that a buyer would still have bought it but for a lesser price. In this instance, plaintiff is entitled to a reduction of the purchase price.

172.   Defendants are liable as bad faith sellers for selling a defective  product with knowledge of the defect, and thus, are liable to plaintiff for the price of the subject product, with

interest from the purchase date, as well as reasonable expenses occasioned by the sale of the subject products, and attorneys' fees. As the manufacturer of the subject products, under Louisiana law, defendants are deemed to know that their Defective Engines and braking systems possessed a redhibitory defect. La. C.C. art. 2545.

173.   As a result of the foregoing acts and omissions, plaintiff suffered economic losses including but not limited to excessive repair and operating costs, and losses in revenue due to the disproportionate downtime that resulted from the Defective Engines and Defective Brake Systems.

174.   By reason of the foregoing, plaintiff has sustained damages as alleged herein and incurred attorneys' fees which it is entitled to recover from defendants.

**VII. Seventh Cause of Action: Breach of Warranty of Fitness For Ordinary Use**

175.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

176.   In addition to warranting against redhibitory defects, defendants warranted that the subject products are reasonably fit for their ordinary and intended use. La. C.C. art. 2524.

177.   The subject products are not safe and have numerous product defects, performance defects, and inefficiencies. Thus, defendants' products are unfit and inherently dangerous for ordinary use.

178.   As a direct and proximate result of defendants' actions, plaintiff suffered economic losses including but not limited to excessive repair and operating costs, and losses in revenue due to the disproportionate downtime that resulted from the Defective Engines and Brake Systems.

179.    By reason of the foregoing, Plaintiff has sustained damages as alleged herein.

## DISCOVERY RULE

180.    Plaintiff, B&L Transportation, Inc., had no way of knowing about Navistar's deception with respect to defendants' MaxxForce 7-liter diesel engines and Defective Braking Systems. In fact, it took the Securities and Exchange Commission until March 31, 2016, to file a securities fraud complaint against former Navistar president and CEO, Daniel C. Ustain, who has behind Navistar, Navistar International, and IC's adoption and use of the EGR technology.

181.    Navistar and Navistar International knowingly and intentionally made their false and fraudulent statements precisely to perpetuate the vehicle-purchasing public's false perception of the quality of the Navistar/IC buses specifically to deceive the vehicle-purchasing and vehicle leasing public, including B&L, into continuing to purchase and lease defendants' vehicles by fraudulently concealing the true facts.

182.    Within the requisite prescriptive period, Plaintiff could not have discovered through the exercise of reasonable diligence that Navistar and IC was concealing the conduct and product defects described herein, while misrepresenting performance quality and emissions compliance.

183.    The defendants engaged in conduct that rose to the level of concealment, misrepresentation, fraud, and/or ill practice. Therefore, the defendants' actions effectually prevented the plaintiff from pursuing a cause of action.

184.    Plaintiff did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Navistar and IC concealed such information, which was discovered by Plaintiff only shortly before this action was filed on or about June of 2016.

185.    Thus, the jurisprudential doctrine of *contra non valentem* acts as an exception to the statutory prescriptive rule set forth by Louisiana Civil Code Article 3467 and, therefore,

plaintiff's action is timely.

## ESTOPPEL

186.    Navistar and IC were under a continuous duty to disclose to plaintiff the true character, quality, and nature of their products' quality, performance, and emissions compliance.

187.    Navistar and IC knowingly, affirmatively, and actively concealed the true nature, quality, and character of their Defective Engines and braking systems.

188.    Based on the foregoing, Navistar and IC are estopped from relying on any prescriptive period as a defense to this action.

## JURY DEMAND

Plaintiff demands a trial by jury.

**WHEREFORE**, the aforesaid premises considered, plaintiff prays that defendants, be duly served with a copy of this petition and cited to appear and answer same, and that after due proceedings had, that there be a judgment herein in favor of plaintiffs and against defendants herein finding said defendants liable jointly, severally, and in solido for the full amount of plaintiff's damages, and all costs together with legal interest thereon from the date of judicial demand until paid.

Respectfully submitted:
**IRPINO, AVIN & HAWKINS LAW FIRM**

**ANTHONY IRPINO (#24727)**
**LOUISE C. HIGGINS (#31780)**
**KACIE F. GRAY (#36476)**
2216 Magazine Street
New Orleans, Louisiana 70130
Telephone:    (504) 525-1500
Facsimile:    (504) 525-1501
***Attorneys for the Plaintiff***